Filed 7/30/14  P. v. Melendez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br> v.<br><br>RONALD PERALTA MELENDEZ,<br><br> Defendant and Appellant. | G047964<br><br>(Super. Ct. No. 09CF0883)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed in part, reversed in part.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland Assistant Attorney General, Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Ronald Peralta Melendez was charged in a five-count first amended information with assaulting Julio G. (Julio) with a semiautomatic firearm on December 4, 2007 (Pen. Code, § 245, subd. (b), count 1; all further statutory references are to the Penal Code unless otherwise stated), attempted premeditated murder of Julio (§§ 664, 187, subd. (a), count 2), and active participation in a criminal street gang (§ 186.22, subd. (a), counts 3, 5). He was also charged with the December 21, 2007, possession of a firearm by a convicted felon (§ 12022, subd. (a)(1), count 4).

The information alleged Melendez personally used a firearm in the commission of count 1 (§ 12022.5, subd. (a)), vicariously discharged a gun and caused great bodily injury in the commission of count 2 (§ 12022.53, subds. (c), (d) & (e)(1)), and committed counts 1 and 2 for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)). It also alleged Melendez had four prior serious or violent felony convictions (§ 667, subds. (a)(1) & (e) (2)), a prior felony conviction for active participation in a criminal street gang, and served four prior prison terms (§ 667.5, subd. (b)).

Trial began on January 18, 2011, but the trial court declared a mistrial on January 26, 2011 after one of the prosecution's key witnesses, Edgar Mendoza Ramirez, gave a statement containing new evidence just before the start of the first trial.

On June 8, a second jury convicted Melendez of all counts. The jury also found he committed counts 1 and 2 for the benefit of, at the direction of, or in association with a criminal street gang, and he vicariously discharged a firearm and caused great bodily injury with respect to count 2. The jury could not reach a verdict on the personal gun use allegations, nor did it find sufficient evidence of premeditation and deliberation.

In a separate proceeding, the trial court found Melendez had suffered four prior serious or violent felony convictions within the meaning of the Three Strikes law (§ 667, subds. (b)-(i)), two prior serious felony convictions under section 667,

2

subdivision (a)(1), and had served four prior prison terms (§ 667.5, subd. (b)). The trial court imposed a total indeterminate term of 60 years to life.

Melendez raises the following challenges to the judgment: (1) the trial court erroneously denied his motions to sever the gang charges and bifurcate the gang enhancements; (2) the gang expert gave improper testimony; (3) there is insufficient evidence to prove the attempted murder, assault with a firearm, and active participation convictions, and the gang enhancement findings; (4) the trial court improperly denied his request for a pinpoint instruction on third party culpability; and, (5) the trial court improperly denied his *Pitchess* motion.[1] We agree there is insufficient evidence for the December 4 active participation conviction, and affirm the judgment in all other respects.

**FACTS**

Around noon on December 4, 2007, someone shot Julio outside the Western Union office at the intersection of 17th and Spurgeon Streets in Santa Ana. Julio had driven there in the company of a friend, Daniela H. (Daniela). On December 21, 2007, police officers responding to a report of a man brandishing a gun, found a black Astra semiautomatic nine-millimeter handgun in a house then occupied by Melendez, Rocko Savastano, Robert Reyes, Jr., and Arthur Martinez, all members of either the Logan Street or Delhi criminal street gangs and convicted felons.

*1. December 4*

    *a. Daniela*

Daniela was 15 years old when the shooting occurred. Santa Ana Police Officer Gregory Stys arrived at the scene of the shooting within minutes. Stys was familiar with the area because he had previously been assigned to patrol there. During this time he had talked to numerous members of the Logan Street criminal street gang and noticed Logan Street graffiti in the area.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

3

Stys first contacted Julio, who was lying on the ground and bleeding from a wound in his torso. Then he spoke to Daniela, who appeared to be upset and erratic. Daniela told Stys she had seen the shooting, and she gave a description of the suspect: a male Hispanic in his 20's with short black hair and a mustache, clothed in blue jeans and a white T-shirt. Stys later walked the area where the shooting occurred and found a nine-millimeter shell casing, a live nine-millimeter round, and a white stick in close proximity to each other.

In early February 2008, Santa Ana Police Detective Eric Paulson and Detective Nunez interviewed Daniela at her home. To Paulson, Daniela seemed nervous, scared, and reluctant to talk to the police.

Daniela told Paulson that on the day of the shooting, she had seen three or four young Hispanic men walking on the sidewalk near the Western Union as Julio pulled into the parking lot. She told Julio to wait until this group passed by them before he got out of the car, but Julio said "nah" and got out of the car immediately. As Julio got out of the car, and as Daniela was in the process of getting out of the car, she noticed Julio was running away. Daniela said she did not hear any words exchanged, but one member of the group of Hispanic men pulled out a black handgun and shot Julio. The other members of the shooter's group ran, but the shooter walked or limped away.

Daniela told Paulson she saw the gunman from about five feet away. She described him as Hispanic, with a "little bit beard" and short hair. She thought he looked to be in his mid-to-late 20's. Paulson showed her a six-pack photographic lineup he prepared using a computer program that takes the reported height, weight, age, and race of a suspect to generate comparable pictures from the Orange County jail's data base.

Melendez's photograph was in the number two position. Paulson had obscured his many tattoos because no witness had reported seeing tattoos on the shooting suspect. After reading a standard admonishment, Paulson asked Daniela to take a look at the photo array. After about 20 seconds, Daniela pointed to Melendez's photograph and

4

said, "He looks . . . ." Paulson then asked how many young men there were in the group with the shooter and Daniela said there had been five. When Paulson asked whether the person she pointed to was the shooter or one of the other young men in the group, Daniela responded, "Yea, the guy that had the gun." Paulson also showed Daniela a second six-pack photographic lineup, but she was unable to identify anyone from that photo array.

At trial, Daniela claimed to remember little of the shooting and frequently testified she could not recall making certain statements. In fact, she testified she had poor eyesight and needed glasses, and she claimed to have difficulty seeing things in the courtroom. She also testified she felt pressured to identify someone from the police photographic lineup, and she had assumed Melendez was the shooter because he was the only person she had seen at the scene of the shooting.

### b. Ramirez

On the day of the shooting, Ramirez told Santa Ana Police Officer Jesse Flores that he heard voices arguing on the other side of a brick wall at the back of the parking area. He said it sounded like a gang "hit-up." He also told Flores one of the suspects involved in the shooting had used a white stick or cane similar to the one found at the scene.

Ramirez testified at the second trial pursuant to an agreement with the California witness relocation assistance program (CALWRAP), a program designed to relocate and house victims or witnesses who are threatened or may be targeted due to their testimony. The district attorney's office applied for these funds because Ramirez lived in the heart of Logan Street's claimed territory. He had received a total of $4,198.51 in assistance with his relocation by the time of trial. Although he had outstanding arrest warrants for his failure to complete courses related to convictions for driving under the influence and misdemeanor domestic violence, Ramirez was not arrested as a result of his coming to court to testify.

5

During his trial testimony, Ramirez said that in May 2007 he lived in the area around 17th and Spurgeon Streets.  On the day of the shooting, he had been hanging around a wall that bordered the parking lot because his friend owned one of the stores near the Western Union, and he "had a felling something was going to happen." Sometime around noon, Ramirez looked over the wall to see what was going on in the alley.  From about 29 feet away, Ramirez saw a group of two or three Hispanic men standing in the parking lot.  One of these men was holding a white stick, a shirt, and a gun.  Ramirez ducked down behind the wall and then heard a gunshot.  He ran home, but after a few minutes, Ramirez came back and "checked out the scene."

Ramirez identified Melendez as the person who had the gun, the shirt, and the white stick, although he also testified he had seen Melendez walking around the neighborhood 45 minutes to an hour before the shooting, and that he had seen him in the neighborhood a couple of times before.  On each prior occasion, Ramirez said he "paid respect" to Melendez.  Ramirez also said when he and some family members saw Melendez before the shooting, they "had a feeling that something was going to happen."

Ramirez admitted he lied to police in 2007 and 2008 when he told them he had not seen the shooting.  He also admitted he hid from the police to avoid becoming involved in the case, and in 2011 Santa Ana police officers tricked him into coming to the police station by telling him someone in his family had been the victim of identity theft.

Following his live testimony, Ramirez's testimony from another court proceeding was read to the jury.  In this version, Ramirez said he heard people arguing in English and Spanish in the parking lot before the shooting.  He knew gang members "hit-up" strangers and rivals by asking, "Where are you from," but he could not recall if that was what he heard.  Ramirez saw several male Hispanics, Melendez included, standing in a group just before the shooting.  Melendez was limping and using a white stick or cane to walk, and he was carrying a gun.  Ramirez said he heard a gunshot, ducked down, and

6

then ran back to his parent's home. When he went back to the scene of the shooting minutes later, he realized someone had been shot.

2. *December 21*

   a. *Investigating Officers*

Santa Ana Park Ranger Sergeant Richard Murg testified that around 4:00 p.m. on December 21, 2007, he was patrolling the area around the 700 block of Poinsettia Street in Santa Ana when a car suddenly swerved in front of him and came to a stop. Murg slammed on his brakes and stopped. Then he saw two male Hispanics jump out of the car and run toward his patrol car. Murg testified, "They both got out of the car at the same time, yelling and screaming in broken English about a man that had a gun. They said this man jumped out in front of their car." The two men directed Murg to the spot where they said a man had confronted them with a gun. They drove a short distance and then pointed to a specific house on Civic Center Boulevard, which happened to be Martinez's home. Murg called for backup, and then he noticed the two men were gone.

Santa Ana Police Detective Mary Campuzano was dispatched to the scene. She and other officers set up a perimeter around the house and directed anyone inside to come out. Reyes came out voluntarily. He told Campuzano that Melendez "came in through the rear gate of the yard, which is on the west side of the property, was yelling cops, cops, come here. And then they both went to the rear entrance of the residence. And then I believed that's when Mr. Melendez asked him or said something to the effect of, hold this, fool. And that's when Mr. Reyes noticed that [Melendez] had a handgun in his hand."

When police officer's entered Martinez's home, they found a loaded, nine-millimeter black Astra semiautomatic handgun hanging inside a cloth bag in the kitchen. A ballistics comparison later determined the spent nine-millimeter shell casing found at the scene of the December 4 shooting had been fired from this gun.

7

#### b. *Reyes*

Reyes testified under a grant of immunity. He explained that when he went to Martinez's home in Santa Ana the afternoon of December 21, Savastano was washing his car outside and Martinez was watching him. As Reyes came out of the house to join them, several police officers surrounded the residence. The police officers immediately detained him. In this version, Reyes claimed he did not know Melendez was in the home until Melendez came outside. Melendez, Reyes, Savastano, and Martinez were all convicted felons and not allowed to possess firearms. In addition, all four young men were documented members of either the Logan Street or Delhi criminal street gangs.

### 3. *Forensic Evidence*

Melendez's DNA was found on the white stick recovered at the scene of the shooting, although it was conceded DNA transfer was possible. DNA samples were taken from Melendez but not Savastano, Martinez, or Reyes. Two latent fingerprints were also found on the white stick. A fingerprint analyst determined one of the prints matched Melendez's right ring finger. The analyst was not asked to make a comparison with any other than Melendez's fingerprint exemplar.

### 4. *Melendez's Statements*

On January 30, 2008, Paulson interviewed Melendez after advising him of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Melendez denied ever using a walking stick or cane. When prompted, Melendez said "[t]here was no way that his fingerprints would end up on anything that he could have used as a crutch." Paulson also testified Melendez had the word "Logan" tattooed on the back of his head and neck.

Paulson testified he had attended two to three hours of formal training on the Logan Street gang, in addition to hundreds of hours of general training on criminal street gangs. In addition, he has talked to numerous other police officers with experience with the gang and at least 50 Logan Street gang members. According to Paulson, the area where the shooting occurred saw a lot of Logan Street gang activity.

8

*5. Gang Expert Testimony*

Detective Roland Andrade testified as the prosecution's gang expert. Andrade described a traditional Hispanic street gang as being a well-established organization with participation from family members of multiple generations. These gangs tend to be turf based, and gang members typically commit similar types of crimes, including "robberies, shootings, possession [of] weapons, selling narcotics, murder, attempted murder, auto thefts, [and] carjackings."

Andrade explained gang-related crime witnesses and victims are often reluctant and even fearful. He said, "It is not uncommon for a witness or a victim to essentially draw an imaginary line in the sand and say, I'm willing to go in and admit to this much information, and I'm not going to say a gang name, I'm not going to point to the individual in court. They have a preconceived notion as to what will not get them in trouble in the street environment, but yet will keep them out of the realm of legal problems as opposed to coming in here and blatantly perjuring themselves."

Andrade stated that in gang culture, the terms "snitch" and "rat" generally apply to individuals "who have provided information to law enforcement regarding some form or other regarding gang activity." He also explained "respect is an attribute that all gang members thrive [*sic*] to receive." Gang members demand respect from other gang members, rivals or allies, and people living in their gang's claimed turf. Respect is vital, and it is gained by committing violent crimes. The more violent the crime, the more respect accorded the gang members who commit the crime and their gang as a whole. In fact, violent crime committed by known gang members promotes the gang by making community members reluctant to report gang-related crimes. It was Andrade who advocated relocating Ramirez to protect him from gang reprisal.

Andrade testified Logan Street is a traditional Hispanic street gang with a claimed "turf" that includes the Santa Ana neighborhood where the shooting occurred. At the time, the gang had approximately 40 active members. Their most common symbol

9

is the word "Logan," although gang members sometimes also use "Barrio Logan." Individual members will frequently have tattoos like "Logan," the number "13," and/or the word "Sur." These tattoos represent the "level of importance or allegiance" to the gang, although all gang members tend to view their tattoos as signifying lifelong allegiance to their gang. Different gangs will form alliances with each other for safety and power. One of Logan Street's allies is the Delhi gang.

In Andrade's opinion, the Logan Street gang's primary activities are the possession of weapons and street-level robberies. He testified about two predicate crimes, a 2007 assault with a semiautomatic gun and a 2007 robbery, crimes committed by active Logan Street gang members Jorge Perez and Alfredo Rios Saenz, respectively.

Andrade also testified he reviewed the records of other criminal cases involving Melendez, and other types of prior contacts Melendez had with law enforcement. He discovered Melendez readily admitted membership in Logan Street and he had been served with a STEP notice[2] in 2004. In fact, Melendez had claimed Logan Street since he was 12 or 13 years of age. Melendez had several gang-related tattoos, including the word "Logan" tattooed on the back of his head and "Sur" on his chest.

Andrade opined Melendez was an active Logan Street gang member in 2007. Based on hypothetical questions that mirrored the facts of the case, Andrade also testified the shooting was committed for the benefit of the Logan Street gang. The crime benefitted the gang by demonstrating its members' willingness to commit violent crimes on a "random individual" in their claimed turf. Plus, the fact the crime occurred in broad daylight suggested to Andrade that the crime was "almost like a challenge to the residents around there, I dare you to tell on us."

---

[2] California Active participation Enforcement and Prevention Act (§ 186.20 et seq.) STEP notices are a method of notifying someone that the organization he or she associates with is considered a criminal street gang.

10

**DISCUSSION**

*1. Gang Evidence*

Melendez raises two challenges to the gang evidence. First, he claims the trial court erroneously denied his motions to sever the substantive gang charges and enhancements from the underlying crimes. Second, he claims a portion of Andrade's testimony exceeded the permissible scope of an expert witness. We find neither contention persuasive.

*a. Severance and Bifurcation*

Melendez moved pretrial to sever the active participation charges and bifurcate the gang enhancement allegations from the other criminal charges. In support of his motions, Melendez argued the admission of gang evidence violated Evidence Code sections 1101, subdivision (b) and 352. He reasserts these contentions on appeal, and also contends the admission of gang evidence at trial violated his constitutional right to due process of law. None of his contentions has merit.

We review the trial court's ruling on severance and bifurcation motions for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28 (*Marshall*).) "Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*Ibid*.)

11

Regarding severance, when "the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish an abuse of discretion by the trial court. [Citations.] We review the trial court's decision 'in light of the showings then made and the facts then known.' [Citation.]" (*Marshall*, *supra*, 15 Cal.4th at p. 27.)

The conservation of scarce judicial resources militates in favor of joinder. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*).) "Severance of charged offenses is a more inefficient use of judicial resources . . . because severance requires selection of separate juries, and the severed charges would always have to be tried separately." (*Ibid.*) Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses carries a very heavy burden to "'*clearly establish* that there is a substantial danger of prejudice requiring that the charges be separately tried'" before a severance can be granted. (*People v. Burnell* (2005) 132 Cal.App.4th 938, 946; see § 954.)

In this case, the trial court did not abuse its discretion by denying severance of the substantive gang offenses from the other crimes. The gang evidence was cross-admissible as to motive, identity, and the reluctance of certain witnesses to testify, all issues put into controversy by Melendez's not guilty plea. The substantive active participation count required much the same evidence to prove, and was no more potentially inflammatory than the other charges. (See, e.g., *Hernandez*, *supra*, 33 Cal.4th at p. 1051.) In fact, in some ways the gang evidence was necessary to make sense of an otherwise senseless series of events. Moreover, the jury was correctly instructed on the limited purpose of gang evidence, and we presume the jury followed these instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Regarding bifurcation, a trial court has broad discretion to control the conduct of a criminal trial. (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.) The trial court's power to bifurcate the trial of a gang enhancement from the trial of the substantive offense is implied in section 1044. (*Ibid.*) Although a bifurcated trial is held before the

12

same jury or the court, and the gang enhancements would have to be tried only if the jury found the defendant guilty, the principles relevant to severance are also relevant here. Moreover, "the trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged. [Citation.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1048-1050.)

As noted by the *Hernandez* court, and pertinent here, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1049-1050.)

The *Hernandez* court also observed that bifurcation may be necessary where the predicate offenses offered to establish the pattern of criminal activity are "unduly prejudicial," or where some of the other gang evidence may be "so extraordinarily prejudicial, and of so little relevance to guilt," that it may influence the jury to convict regardless of the defendant's guilt." (*Hernandez, supra*, 33 Cal.4th at p. 1049.) But here, the gang evidence was necessarily intertwined with the charged offenses as to several relevant issues, particularly motive, identity, and the reluctance of witnesses to testify. In addition, evidence of the predicate offenses was no more prejudicial than evidence of the charged crimes.

Melendez bitterly complains that motive is not an element of the crimes. But as has been stated many times, "[m]otive is always relevant in a criminal prosecution." (*People v. Perez* (1974) 42 Cal.App.3d 760, 767.) This is especially true in cases such as this one where the very reason for the underlying crime is gang related.

13

(*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168.)  Viewing the evidence in the light most favorable to the judgment, a gang hit-up in gang territory by a known gang member with a gun when this gang member later tries to dispose of the gun in a house full of other gang members certainly qualifies as grounds for joinder.

b. *Due Process*

Finally, Melendez argues the denial of his motions for bifurcation and/or severance of the gang issues and evidence violated his due process right to a fair trial on the assault with a semiautomatic firearm, attempted murder and gun possession charges, resulting in a fundamentally unfair trial, and the error entitles him to a new trial.

On the due process issues, we find *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*) instructive.  "To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.  'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.'  [Citation.]  'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process."  [Citation.]'  [Citation.]" (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 229-230, fn. omitted.)

In *Albarran*, the trial court admitted relevant and irrelevant gang evidence, which included other gang members' threats to kill police officers, descriptions of crimes committed by other gang members and references to the Mexican Mafia prison gang. (*Albarran*, *supra*, 149 Cal.App.4th at pp.214-217.)  The appellate court characterized the irrelevant gang evidence as "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues."  (*Id.* at p. 230, fns. omitted.)  The court further described this

14

evidence as "overkill," and said it was "troubled" by the trial court's failure to scrutinize the potential prejudice of the gang offense on the substantive charges. (*Id.* at p. 228.)

Here, Melendez was charged with both gang substantive offenses and gang enhancements. The jury was properly instructed on the limited admissibility of the gang evidence, and as will be discussed *post*, the jury's verdict on count 5 and the gang enhancements are supported by substantial evidence. Andrade's expert testimony was limited to the essential facts needed by the prosecution to prove the elements of both the substantive offenses and the enhancements, and this evidence was no more sensational or inflammatory than evidence of the attempted murder and assault charges, which Melendez committed in broad daylight, and the gun possession charges that linked him to the other crimes. The instant case is simply not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran, supra,* 149 Cal.App.4th at p. 232.)

### c. Alleged Improper Expert Testimony

During redirect examination, the prosecutor engaged Andrade in the following colloquy: "[Prosecutor]: You're aware of [Daniela's] testimony where she identified Mr. Melendez as the person with a gun; is that correct? [¶] [Andrade]: Yes. [¶] Q. You're aware that Mr. [Ramirez] identified Mr. Melendez as the individual with the gun; Is that correct? [¶] A. Yes. [¶] Q. You're aware that the white cane that Mr. Melendez was seen holding returned to him through DNA evidence; is that correct? [¶] A. Yes. [¶] Q. You're aware that the white cane in which Mr. Melendez was seen holding came back to him through fingerprint evidence; correct? [¶] A. Yes. [¶] Q. Would you be here testifying against Mr. Melendez if you believed that anyone other than Mr. Melendez was involved in this case? [¶] [Defendant counsel] Objection calls for speculation. [¶] The court: Sustained. [¶] Q. Do you believe Mr. Melendez was involved in this case? [¶] A. Yes."

15

On appeal, Melendez contends Andrade's statement he believed Melendez to be "involved in this case" was impermissible expert testimony. The Attorney General correctly argues Melendez failed to object to this final statement, and thus failed to preserve the issue for appeal. (Evid. Code, § 353, subd. (a).) Nevertheless, assuming error, we find no prejudice resulted from this single statement.

A verdict cannot be set aside for the erroneous admission of evidence if the error did not result in a miscarriage of justice. (Evid. Code, § 353; *People v. Rodrigues* (1994) 8 Cal.4th 1060.) In a trial that produced 1,171 pages of reporter's transcript, 102 of which was Andrade's expert testimony, it would seem nearly impossible for one statement by him to result in a miscarriage of justice, and that is the case here.

Furthermore, Andrade had already given his expert testimony on Hispanic gang culture, both general and specific to Logan Street, the types of crimes committed by Logan Street gang members, and his opinion that Melendez was an active Logan Street gang member on the relevant dates. He also explained what exactly an active gang member is, and how these crimes benefitted Logan Street. Consequently, there was little doubt as to Andrade's belief that Melendez was "involved" in the crime. Moreover, the trial court instructed the jury on the proper limitations of gang evidence, how to view expert witnesses' testimony, and the prosecution's burden of proof. Thus, we find no prejudice in Andrade's response to the prosecutor's final question, proper or not.

2. *Sufficiency of the Evidence*

Melendez challenges the sufficiency of the evidence to support the attempted murder, assault with a firearm, and active participation convictions, and the gang enhancement findings. He asserts the evidence established nothing more than his mere presence at the scene of the shooting. We disagree.

To resolve challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment and determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

16

(*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  This court reviews "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Furthermore, we presume in support of the judgment the existence of every fact the trier reasonably could have deduced from the evidence and draw all reasonable inferences in support of the judgment.  (*People v. Rayford* (1994) 9 Cal.4th 1, 23.)  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]"  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  Generally, a judgment should not be reversed on ground of insufficiency of the evidence unless it appears that under no hypothesis is it sufficient to support the conviction.  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 329.)

*a. Attempted Murder and Assault With a Firearm*

"Attempted murder requires (1) a specific intent to kill and (2) a direct but ineffectual act toward accomplishing the intended killing.  [Citation.]  Unlike murder, an attempted murder therefore requires express malice and cannot be proved based upon a showing of implied malice."  (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.)

CALCRIM No. 875 told the jury that to prove Melendez committed an assault with a semiautomatic firearm the prosecution had to prove the following:  (1) "defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person"; (2) "the defendant did that act willfully"; (3) "[w]hen the defendant acted he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in

17

the application of force to someone"; and (4) "[w]hen the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person."  And it explained that "[s]omeone commits an act willfully when he or she does it willingly or on purpose."

Melendez claims the evidence does not prove he shot Julio, or aided and abetted another in the shooting.  The primary thrust of his contention is that no reasonable juror could have relied upon the brittle credibility of Daniela and Ramirez.  However, we may not reject the statements given by a witness who has been believed by the jury, unless we find them physically impossible, or apparently false.  (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.)  """"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]""""  (*Ibid.*)

In this case, conflicting testimony aside, there was nothing impossible or apparently false in Daniela's or Ramirez's testimony.  Viewing the evidence with the proper standard of review in mind, the prosecution proved that on December 4, Melendez, a Logan Street gang member, walked around Logan Street's claimed territory with a gun and a cane.  He and some other young men walked up to Julio, issued a gang challenge, and shot him.  Melendez either shot Julio himself, or he handed the gun to the shooter.  As Daniela testified, Julio was at the Western Union to cash a check, not to cause trouble, and he had barely gotten out of his car when he was shot at close range.

Because express malice is manifested by a deliberate intention unlawfully to take away the life of a fellow creature (§ 188), evidence Melendez shot or aided and abetted another in the shooting, is sufficient to prove attempted murder.  (See *People v. Ramirez* (2006) 39 Cal.4th 398, 465 [defendant acted intentionally by shooting the victim twice at close range]; *People v. Smith* (2005) 37 Cal.4th 733, 743[the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice].)

18

Melendez claims the evidence did not establish his identity as the young Hispanic man with the white stick and gun, but this view of the record is improperly skewed in his favor and in contravention of the standard of review. He also claims the evidence fails to support the convictions under a theory he aided and abetted another in the shooting. But again, reaching this conclusion requires that one ignore the proper standard of review. While no evidence established the exact identity of the three or four other young Hispanic men with Melendez, a reasonable inference in light of the totality of the record is that Melendez, a self-admitted Logan Street gang member, was walking around Logan Street's claimed territory with a gun and backup. Then the group started either a fight with Julio, or issued a gang challenge. After all, Ramirez said he heard arguing and a gang hit-up before shots were fired. So a reasonable jury could conclude Melendez, with the support of a number of other young men, asserted Logan Street's dominance in the gang's claimed territory by committing a violent crime, either personally or by aiding and abetting another. Recognizing the power of respect in gang culture, and understanding how individuals and their gangs gain this respect, completes the picture. In short, Melendez is simply wrong when he asserts the prosecution proved nothing more than his "mere presence at the scene of the crime and his gang status."

*b. Gang Crimes and Enhancements*

Melendez also challenges the sufficiency of the evidence to support the active participation in a criminal street gang crimes and the gang enhancements. We disagree, except as to the December 4 active participation conviction in count 3.

The substantive offense of active participation in a criminal street gang has three elements: (1) participation in a street gang that is more than nominal or passive; (2) knowledge the gang's members engage in, or have engaged in, a pattern of criminal gang activity; and (3) willfully promoting, furthering, or assisting in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) Melendez challenges the sufficiency of the evidence on the third element, and claims

19

there is no evidence he willfully promoted, furthered, or assisted the felonious criminal conduct of any other Logan Street gang member on either December 4 or 21.

Melendez primarily relies on *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*). In *Rodriguez,* a case decided after this case was tried, our Supreme Court held evidence a lone gang member committed a felony does not prove the third element of the offense. (*Rodriguez*, *supra*, 55 Cal.4th at p. 1131.) As the court explained, the word "members" is a plural noun. (*Id.* at p. 1132.) "Therefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22[, subdivision](a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid.*)

Applying *Rodriguez* to the December 4 and December 21 active participation crimes charged in this case leads to different conclusions. At the time of the shooting on December 4, Melendez was with four or five young Hispanic males. Daniela described these individuals as "gang types." However, the members of this group were never identified, and the prosecution presented no evidence establishing any of them were Logan Street gang members. Thus, there is insufficient evidence to support the third element and the active participation conviction in count 3 must be reversed.

We reach the opposite result with respect to the December 21 active participation crimes charged in count 5. On that day, Melendez ran to Martinez's house with the gun used to shoot Julio. There he found Logan Street and Delhi gang members. He asked them to help him hide the gun and they did so. Thus, there is sufficient evidence to support the third element and the active participation conviction in count 5.

Our reversal on count 3 has no effect on the gang enhancement finding associated with count 1 or count 2. As the court observed in *Rodriguez,* there are several differences between the active participation offense (§ 186.22(a)) and the gang enhancement (§ 186.22(b)(1)). (*Rodriguez*, *supra*, 55 Cal.4th at p. 1130, fn. 5.) Thus, a

20

lone gang member may be subjected to the enhanced penalties provided under section 186.22, subdivision (b)(1). (*Rodriguez, supra*, 55 Cal.4th at p. 1139.)

To prove a gang enhancement allegation under section 186.22, subdivision (b)(1), the prosecution must prove (1) the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, and (2) the defendant had the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.) Andrade fully explained how the shooting benefitted Logan Street by gaining respect and intimidating community members and witnesses. And under these circumstances the jury could reasonably infer Melendez had the required specific intent. Consequently, sufficient evidence supports the gang enhancements.

*3. Third Party Culpability Instruction*

Melendez requested the following pinpoint instruction on third party culpability: "You have heard evidence that a person other than the defendant committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilt. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. There, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt. Evidence that another person committed the charged offense may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

Defense counsel stated he intended the instruction to be used solely on the gun possession charge because Reyes, Martinez, and Savastano were also gang members and convicted felons for whom gun possession was a crime. The trial court ruled the instruction was inapplicable, citing the fact that possession includes both actual and

21

constructive possession. The trial court further determined the proposed instruction could confuse the jury, and that CALCRIM No. 2511,[3] the pattern instruction for the crime, was sufficient. The trial court's ruling was correct.

Possession may be constructive or actual, and possession may be shared by two or more people. (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417.) To prove possession or constructive possession of a weapon, the prosecutor must prove three elements: the defendant's (1) knowledge of the weapon, (2) his or her right to control the weapon, either controlling it directly or through another person, and (3) general intent to possess it. (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 130.)

In this case, Reyes testified Melendez came to Martinez's home with the nine-millimeter gun in hand. He asked Reyes to help him hide the gun, and apparently that is what they tried to do. Under the law, liability for the crime could also rest with Reyes, Martinez, and Savastano, but that did not preclude Melendez's conviction for the offense. In short, we agree with the trial court.

CALCRIM No. 2511 is a correct statement of the law, and it adequately defined possession as relevant in this case. Furthermore, at least one part of Melendez's pinpoint instruction is misleading, if not incorrect. The statement, "Evidence that another person committed the charged offense may by itself raise a reasonable doubt as to the defendant's guilt[,]" is not true if, as here, multiple people may have had simultaneous constructive possession of an item. Consequently, we find no instructional error.

*4. Pitchess Review*

Following January 2011's mistrial, Melendez filed a *Pitchess* motion that sought discovery relating to complaints about prior acts of falsification of reports,

---

[3] As given in this case, CALCRIM No. 2511 explained the concept of constructive possession as follows: "Two or more people may possess something at the same time. [¶] A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person."

22

wrongful acts involving moral turpitude, illegal detentions, searches, or seizures, and any reports relevant to the officers' characters from the law enforcement personnel files of Santa Ana Police Corporal Brown (No. 2681), Campuzano (No. 895), and Murg (No. 8).

After reviewing defense counsel's sealed declaration in support of the motion, the trial court found good cause to conduct an in camera review with respect to Brown and Campuzano. After the trial court conducted an in camera review of the personnel files produced, the trial court stated it found no records to disclose and sealed the record of the proceedings.

Melendez requests appellate review of all the documents produced to the trial court in response to his *Pitchess* motion. However, an appellate court need not review the individual documents produced at the hearing. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209.) When challenged on appeal, the trial court's decision regarding the discoverability of material in police personnel files is reviewed under the abuse of discretion standard. (*People v. Cruz* (2008) 44 Cal.4th 636, 670.) This court ensures the lower court's compliance with the procedural guideline set out in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1230 (*Mooc*).

As noted, the documents screened by the trial court were not made part of the record on appeal. However, the sealed transcripts of the in camera proceedings indicate the trial court complied with all procedural requirements. The custodian of records was sworn before the court and testified that all records responsive to the defense motion were available for the court's review. (*Mooc, supra*, 26 Cal.4th at pp. 1228-1230; *People v. White* (2011) 191 Cal.App.4th 1333, 1340.) The court, not the custodian of records, described each document for the record, conducted a thorough review of the individual documents, and then determined the relevancy of these documents to the purpose for *Pitchess* motions. (*Mooc*, at pp. 1229-1230.) The court found nothing responsive to Melendez's motion in either officers' personnel file, and ordered the record sealed. We have reviewed the sealed record, but find no indication of error. Thus, there

is no justification for remanding the matter for further proceedings. (See *People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415.)

## DISPOSITION

The active participation conviction on count 3 is reversed for insufficiency of the evidence. In all other respects, the judgment is affirmed. The clerk of the superior court is directed to amend the abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.


THOMPSON, J.

WE CONCUR:


FYBEL, ACTING P. J.


IKOLA, J.

24